UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
─────────────────────────────────

ROSHELL ROJEAN LUCIUS,

              Plaintiff,

     -vs-

CAROLYN COLVIN, Commissioner of
Social Security,

              Defendant.
─────────────────────────────────

**DECISION and ORDER
No. 6:12-CV-6531(MAT)**

## I.   Introduction

Roshell Rojean Lucius ("Plaintiff" or "Lucius"), proceeding
pro se, brings this action pursuant to Title XVI of the Social
Security Act ("the Act"), seeking review of the final decision of
the Commissioner of Social Security ("the Commissioner") denying
her application for Supplemental Security Income ("SSI") and
Disability Insurance Benefits ("DIB"). This Court has jurisdiction
over the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c). Presently
before the Court is Defendant's motion for judgment on the
pleadings pursuant to Rule 12(c) of the Federal Rules of Civil
Procedure.

## II.  Procedural History

On October 12, 2009, Plaintiff applied for benefits, alleging
disability beginning April 1, 2008, due to fibromyalgia, carpal
tunnel syndrome, arthritis, foot pain and bone disease in her legs.

T.200-08, 209-12, 244.[1] These applications were denied. T.99, 100, 118-33.3 Plaintiff appeared with counsel, Ida Comerford, Esq., and testified on October 14, 2010, before Administrative Law Judge Michael Devlin ("the ALJ"). T.77-98. On January 14, 2011, the ALJ issued a decision finding Plaintiff not disabled. T.21-37. The Appeals Council denied Plaintiff's request for review on August 21, 2012, making the ALJ's decision the final decision of the Commissioner. T.1-6. Plaintiff then commenced this lawsuit.

## III. Summary of the Administrative Record

### A.   Plaintiff's Medical History

Below, the Court summarizes the medical history pertinent to the severe impairments found by the ALJ: bilateral carpal tunnel syndrome, degenerative disc disease, degenerative joint disease, obesity, and fibromyalgia. T.27.[2] With regard to treatment providers and notes not included in the summary below, the Court refers to, and incorporates herein, Defendant's comprehensive summary of the relevant medical evidence of record set forth in her Memorandum of Law.

---

[1]

Numerals preceded by "T." refer to pages from the transcript of the administrative record, submitted by Defendant as a separately bound exhibit in connection with her motion for judgment on the pleadings.

[2]

Plaintiff apparently underwent hammer toe surgery on October 23, 2008, Ex. B1F, but she did not provide any records from her podiatrist. The ALJ determined that there was no evidence to support a finding that she had a medically determinable foot problem that had lasted at least 12 months. T.27.

Throughout the time-period relevant to her benefits applications, Plaintiff has complained of back pain as well as diffuse muscle pain and joint pain, in varying degrees of severity. Magnetic resonance imaging (MRI) in May 2008 showed mild degenerative changes in her back; prominent degenerative changes with multilevel spinal stenosis and neural foraminal narrowing; and showed reversal of the normal cervical lordosis, which could have been secondary to several factors (arthritic change, muscle strain, or spasm). Plaintiff had a small herniated disc making minimal impression on the ventral margin of the thecal sac at L5-S1 without significant stenosis. MRIs of the cervical spine revealed degenerative changes throughout the cervical spine, with moderate to severe spinal stenosis at C3-C4.

Plaintiffs doctors have diagnosed her with fibromyalgia, for which she takes Lyrica. Plaintiff, who is 5'1 1/2" tall, weighed 247 pounds in June 2008; and weighed 270 pounds in March 2010. Her doctors have told her that her obesity increases the pain she experiences from these impairments.

In November 2008, Plaintiff began reporting symptoms consistent with carpal tunnel syndrome (e.g., hand numbness, worse in the morning; and difficulty holding things). Plaintiff was treated with wrist braces for four weeks. An electromyography (EMG) showed carpal tunnel syndrome ("CTS"), and Plaintiff had surgery in March 2009. On April 8, 2009, it was noted that Plaintiff was

"doing well" post-surgery for her CTS. T.321. In May 2009, Plaintiff reported that she was doing well on increased medication. T.323. She had seen an orthopedist, who had recommended aqua therapy for her pain and joint problems. On July 8, 2009, Plaintiff had an appointment at her health center and again complained of generalized pain for the past three to four years. T.325. According to Plaintiff, nothing relieved her pain. T.325.

She returned to the Strong Pain Clinic on July 15, 2009, and reported experiencing pain that was 8 to 10 on a scale of 1 to 10, with 10 being the most severe. T.431. Plaintiff also had not been sleeping well. Plaintiff was to undergo more water-based physical therapy. T.432.

On August 10, 2009, Plaintiff reported that she had been experiencing shoulder pain for a month, about 4 to 6 on a scale of 1 to 10. T.327. On examination, Plaintiff complained of pain on rotation and palpation of the subacromial bursa, but had full supraspinatus and infraspinatus strength. Plaintiff was referred for corticosteroid injections  T.328. On August 21, 2009, Plaintiff received a right shoulder injection. T.355.

An August 22, 2009 x-ray of Plaintiff's right knee showed mild to moderate changes, more so in the patellofemoral compartment. T.347. An MRI of the right knee showed complex degenerative tear of the posterior horn and body of the medial meniscus; intrasubstance degeneration of the lateral meniscus; severe tricompartmental

osteoarthritis with small to moderate effusion; and a pericruciate ganglion cyst. T.348.

Plaintiff underwent left CTS release surgery in August 2009. T.449.

On September 10, 2009, Plaintiff reported that her right shoulder pain had improved after the steroid injection, but now the pain had returned. T.353. On examination, Plaintiff had right shoulder impingement syndrome at 70 degrees abduction, with tenderness over the biceps tendon. T.353. On September 22, 2009, Plaintiff was seen at University Pain Management Center. It was noted that Plaintiff had previously missed multiple clinic visits. T.343. The Lyrica prescribed for her fibromyalgia was working fairly well, but did not relieve her body pain completely. T.343. Plaintiff was tender to palpation in the low back and bilateral scapular area. T.343. Plaintiff was to continue Lyrica, but opiates were not indicated. T.343. Plaintiff was officially discharged from the clinic for multiple cancellations and no-shows. T.343.

A September 25, 2009 x-ray of the right shoulder showed mild arthritic changes. T.314. On September 28, 2009, Plaintiff saw Dr. Bridgette Wiefling, who noted that Plaintiff had not followed up with orthopedics for her knee pain, which was holding up her being seen by physical and occupational therapists. Plaintiff reported that she was sleeping "ok" using amitriptiline. She reported that her low back and knee pain limited her activities,

and at its worse, was a 10 out of 10 in intensity. On examination, Plaintiff had crepitus (crackling) in the right knee, along with an increase in pain with flexion. There was positive joint line tenderness, but no edema. Dr. Wiefling again referred Plaintiff to orthopedics. T.311-12.

An October 29, 2009 x-ray of the right knee showed degenerative joint disease with mild interval progression since 2008. There was predominantly small to moderate tricompartmental spur formation but no visible substantial joint effusion or opaque intra-articular body. T.313.

Drs. Kenneth DeHaven and Christopher English of Strong Hospital examined Plaintiff's right knee on October 29, 2009. Based on their clinical findings, and review of her October x-ray and August 2009 MRI results, they determined that that Plaintiff's pain was likely due to degenerative changes within the right knee, including osteoarthritis, as well as significant medial meniscus tear. Dr. DeHaven informed Plaintiff that she needed to lower her body weight to reduce the forces through her joint. Plaintiff was referred to sports medicine to evaluate her for a right knee arthroplasty, and was told to obtain standing knee x-rays to evaluate the joint spaces. Plaintiff was to continue with her home physical therapy and work on reducing her weight. T.341-42.

On December 4, 2009, Dr. Warren Hammert of Strong Hospital saw Plaintiff for follow-up of her bilateral CTS releases. Plaintiff

complained of mild numbness in all fingers and of pain along the volar side of her left wrist. On examination, Plaintiff had full wrist range of motion and full finger range of motion. Her sensation was intact to light touch and she had good capillary refill. On the right hand side, Plaintiff had a negative carpal tunnel compression test and a negative Tinel's sign at the wrist and elbow. Plaintiff stated that she had a positive Phalen's maneuver in the ring and small fingers, but Dr. Hammert was unable to detect any subluxing of the ulnar nerve over the medial epicondyle. Plaintiff had full range of motion of the wrist and fingers. Dr. Hammert advised Plaintiff to splint her right wrist and elbow, both in extension, while sleeping. He also suggested strengthening and range of motion exercises bilaterally. T.340.

That same day, Plaintiff was evaluated by the hand rehabilitation department and reported pain, at its worse, of 6 out of 10 in intensity. Plaintiff was to undergo rehabilitation and wear removable wrist splints. T.336, 338.

On December 8, 2009, Nurse Practitioner Sophie Dickinson ("Nurse Dickinson") of Jordan Health noted that Plaintiff had joint pain and decreased range of motion in the right knee without erythema or effusion. The rest of the physical examination was normal. T.349.

At the request of the Commissioner, Plaintiff underwent a consultative orthopedic examination by Dr. Sandra Boehlert, on

December 16, 2009. <u>See</u> T.411-13. Plaintiff reported to Dr. Boehlert that all her CTS symptoms had resolved after undergoing surgery in 2009, but had recently recurred. Plaintiff claimed that she experienced numbness bilaterally when engaging in daily activities, including while holding things. According to Plaintiff, she used a "Wii game" joystick "a lot" and had pain and tinging with using the joystick. Plaintiff also alleged nighttime tingling that was worse on the right side. She sometimes used a sling, which helped. Plaintiff claimed that her surgeon advised she may need a second surgery for her right hand. In addition, Plaintiff complained of knee pain, greater in the right than left, for the previous three years when bending and twisting; and low back pain for the previous two years.

Plaintiff reported to Dr. Boehlert that she lived with her fiancé, who did all the cleaning, laundry, and shopping. Plaintiff could cook, but could not stand for a long time. She was able to take care of children occasionally during the week. She could shower, bathe, and dress regularly, and she watched television, listened to the radio, and read. She walked 10 to 15 minutes twice a day to the library and back for therapy. Dr. Boehlert's examination findings and prescribed limitations are discussed in detail below in the section of this Decision and Order addressing the ALJ's residual functional capacity assessment.

Plaintiff saw Dr. Hammert in follow-up for her CTS releases on January 15, 2010. T.456. Plaintiff reported that her tingling and numbness had resolved. Her examination was normal. Plaintiff was to use anti-inflammatory medications as needed and participate in activities as tolerated.

In an assessment for employability dated March 12, 2010, Nurse Dickinson stated that Plaintiff had low back pain and right knee pain as a result of a meniscus tear. See T.490. According to Nurse Dickinson, Plaintiff was "very limited" in walking, standing, sitting, lifting and carrying, pushing, pulling, and bending, and climbing stairs. Nurse Dickinson stated that there was no evidence of limitations in seeing, hearing, speaking, using her hands, or mental functioning. In Nurse Dickinson's opinion, Plaintiff was unable to work because she could not stand for long periods of time and had bending limitations. Nurse Dickinson recommended that Plaintiff attend physical therapy. T.491.

Plaintiff saw Nurse Dickinson just a few days later, on March 22, 2010, and reported that she was doing well after undergoing knee surgery and had limited pain. See T.440-42. Plaintiff ambulated independently without difficulty and her knee, which displayed minimal swelling, appeared to be doing well. Plaintiff denied fatigue. Plaintiff returned to Nurse Dickinson on April 15, 2010, see T.442-43, and denied any fatigue or new motor or sensory loss, and also denied experiencing any pain in the

-9-

previous week. T.443. On examination, Plaintiff complained of left hip pain with range of motion, but could ambulate and change positions without difficulty.

Dr. Hammert saw Plaintiff on April 23, 2010 on follow-up for her CTS release. See T.454. Plaintiff was overall doing "very well" though she reported some tingling and numbness in her hands, and some triggering in her right thumb. An examination was normal, except for the right-side triggering. The tingling and numbness was likely a result of her using crutches after her knee surgery. Dr. Hammert treated Plaintiff's right thumb with a steroid injection.

Plaintiff saw Dr. Hammert on June 3, 2010, T.451, and reported that she experienced no pain and her only symptom was a clicking in her left thumb. On examination, Plaintiff had full finger flexion and extension of her fingers, and could oppose her thumb to her small finger. She had good capillary refill and sensation was intact to light touch. Dr. Hammert did not find any active triggering with flexion of the thumb, an improvement over the previous appointment. Dr. Hammert advised Plaintiff to watch her symptoms for another three to four months.

On June 7, 2010, Plaintiff saw Dr. Baker Mitchell at University Pain, after having been previously discharged from the clinic for multiple no-shows. T.469-70. Plaintiff reported that she took Lyrica and Tramadol for pain, but complained that these

medications provided no relief and made her very tired. She reported receiving multiple injections by other doctors for her shoulder, right thumb, knee, and ankles, with some benefit. Plaintiff had been advised to do aqua therapy, but did not remember ever doing it. Plaintiff admitted that she was able to perform all of her activities of daily living, albeit slowly. She reported taking care of her 16-month-old grandson. On examination, Plaintiff could easily and independently stand from her seated position. She had normal gait with upright posture, and was able to easily walk about the room. Plaintiff had some difficulty walking on her toes and ankles, secondary to discomfort in her feet. Plaintiff had full lumbar range of motion, although she did have tenderness to palpation over bilateral shoulders and much of the muscular structure of the back. Plaintiff complained of pain on hip range of motion on the right. Reflexes were 1+ bilaterally, toes were downgoing, and lower extremity strength was full. A mental examination was normal. Dr. Mitchell assessed diffuse myofascial pain, obesity, multiple joint arthralgias, and an underlying psychoaffective disorder modulating her pain perceptions. Dr. Mitchell opined that Plaintiff should decrease her Lyrica dosage and undergo aquatic therapy.

Plaintiff attended multiple aquatic therapy sessions in June, July, August, and September 2010. T.484-87. Plaintiff tolerated the sessions well and reported that it was helping her. Tr. 484-87. On

August 31, 2010, she reported to her physical therapist that she walked "a lot." T.486. Physical therapy was terminated on September 7, 2010, because Plaintiff's progress had plateaued and she was independent. T.488.

When Dr. Hammert saw Plaintiff on August 10, 2010, Plaintiff reported intermittent triggering. <u>See</u> T.449. On examination, Plaintiff could flex all fingers and oppose her thumb to her small finger. She had some tenderness to palpation over the first dorsal compartment and a positive Finkelstein maneuver on the left side. On the right thumb, Plaintiff had no active triggering, but did have mild tenderness in the A1 pulley region. Dr. Hammert advised her to see a physical therapist for a splint and receive steroid injections if symptoms continued.

On July 22, 2010; July, 30, 2010; and August 27, 2010, Plaintiff saw Dr. Basler and reviewed coping strategies for dealing emotionally with her physical pain. T.462, 463, 464.

Plaintiff saw Nurse Pennella-Vaughan at University Pain Clinic on September 2, 2010, and rated her pain over the previous week as 8 out of 10 on a scale of 1 to 10 in intensity. T.467. Plaintiff had been working on losing weight, and had lost eight pounds. Plaintiff acknowledged that she continued to manage self-care and household tasks, and provided childcare for her 19-month-old grandson. Although she had to stop frequently due to pain, she did "most" activities. Hot showers and baths helped with her pain.

Despite recommendations from her June 2010 visit with Dr. Mitchell, Plaintiff had not seen her primary care provider so she had never decreased her dosage of Lyrica. Plaintiff complained that her sleep was fitful because her grandson was at her home until midnight. She admitted that behavioral therapy was helpful. Plaintiff also alleged that she wanted to come off "almost all medicine" since she did not receive relief, but, as Nurse Pennella-Vaughan noted, Plaintiff's medication dosage and frequency reports varied. T.468. On examination, Plaintiff had 4+/5 strength in all extremities, crepitus and tenderness in the left knee, and tenderness at the trapezius, but otherwise had a normal examination. Plaintiff was again instructed to decrease her Lyrica dosage and continue aquatic therapy.

### B.    Evidence Submitted to the Appeals Council After The ALJ's Decision

Records from Dr. Wiefling, Plaintiff's primary care physician, were submitted for the years dated 2009 to 2011. Dr. Wiefling diagnosed Plaintiff with chronic pain, hyperlipidemia, subacromial bursitis, knee pain, fibromyalgia, obesity, and hypertension. Plaintiff underwent surgery to repair a meniscus tear in the right knee in March 2010. T.492. Plaintiff had been referred to bariatric surgery and was awaiting approval.

### C. Testimonial and Vocational Evidence

Plaintiff, who was 33-years-old on her alleged onset date and 37-years-old on the date of the ALJ's decision, had training as a

certified nurse's aid. She had last worked as a home health aide, which required her to lift up to 300 pounds. T.49. At the time of the hearing, Plaintiff received a stipend from the Department of Social Services for watching her grandson. She had earned $11,886 in 2009 from self-employment, which included taking care of her grandson. She was paid $466.20 in January 2010, $1412.40 in April 2010, $466.20 in May 2010, $488.40 in June and July 2010, and $462.00 in August 2010 for this same activity. T.300-09. Plaintiff testified that her boyfriend helped take care of her grandson by cooking the child's meals and changing his diapers, and that her boyfriend also did everything around the house, other than cooking. T.83. She could prepare very light meals. T.84-85. Plaintiff testified that her feet hurt all the time, and that she used a cane to ambulate, and that her medication caused excessive somnolence. T.91.

A vocational expert did not testify at the hearing.

## IV.  Eligibility Standards for DIB and SSI

In order to be entitled to DIB and eligible for SSI payments, a claimant must demonstrate that she is unable to engage in any substantial gainful activity due to a medically determinable physical or mental impairment, or combination of impairments, which has lasted, or can be expected to last, for a continuous period of at least 12 months. 42 U.S.C. §§ 423(d)(l)(A), 1382c(a)(3)(A). A disabling physical or mental impairment is defined as "an

impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). DIB are unavailable unless the claimant was disabled at a time when she met the insured status requirements of 42 U.S.C. § 423(c), 20 C.F.R. §§ 404.130, 404.315(a). SSI payments may not be issued unless a claimant meets income and resource limitations. 42 U.S.C. §§ 1382a, 1382b.

The five-step sequential evaluation for adjudicating disability claims is set forth in 20 C.F.R. §§ 404.1520 and 416.920. The claimant bears the burden of proof at steps one through four, at which point there is a limited burden-shift to the Commissioner to demonstrate that there is other work in the national economy that the claimant can perform. Curry v. Apfel, 209 F.3d 117, 122-23 (2d Cir. 2000); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

## V.    The ALJ's Decision

At step one, the ALJ concluded that while Plaintiff's babysitting showed that she was not entirely precluded from performing basic work activities, it did not rise to the level of substantial gainful activity. T.26-27. At step two, the ALJ found that Plaintiff has the following severe impairments: bilateral CTS, degenerative disc disease, degenerative joint disease, obesity, and fibromyalgia. T.27. After determining that none of her impairments,

-15-

alone or in combination, satisfied the criteria of the Listings, the ALJ found that she retained the RFC for sedentary work. In other words, Plaintiff could occasionally lift and/or carry up to 10 pounds; frequently lift and/or carry less than 10 pounds; stand and/or walk two hours in an eight-hour workday; and sit about six hours in an eight-hour work day. See 20 C.F.R. §§ 404.1567(a), 416.967(a); Social Security Ruling ("SSR") 83-10. Plaintiff also could push and/or pull up to 10 pounds; occasionally climb ramps and/or stairs, balance, stoop, kneel, crouch, and crawl; and less than occasionally climb ladders, ropes, and scaffolds. T.29. Finally, Plaintiff frequently could handle and finger objects with both hands. T.29. [credibility]

The ALJ found that Plaintiff was unable to perform her past relevant work as a certified nurse's assistant, because this job required more than sedentary exertion. T.32. Plaintiff was a "younger individual" on her alleged disability onset date; had a limited education; and was able to communicate in English. Id. Considering her age, education, work experience, and RFC, the ALJ found that there were jobs that exist in significant numbers in the national economy that she can perform. Id. The ALJ further found that Plaintiff's additional limitations had little to no effect on the occupational bases of unskilled, sedentary work, since most sedentary jobs do not require more than occasional climbing of ramps or stairs, for instance. Therefore, the ALJ found, Plaintiff

had not been under a disability from April 1, 2008, through January 14, 2011, the date of the decision. T.33.

## VI.  Defendant's Rule 12(c) Motion for Judgment on the Pleadings

### A.  General Legal Principles

Federal Rule of Civil Procedure 12(c) ("Rule 12(c)") provides that "[a]fter the pleadings are closed . . . a party may move for judgment on the pleadings." The standard applied to a Rule 12(c) motion is the same as that applied to a Rule 12(b)(6) motion. Bank of N.Y. v. First Millennium, Inc., 607 F.3d 905, 922 (2d Cir. 2010). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). The court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. Id. at 679; see also Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 300 (2d Cir. 2003).

### B.  Unopposed Rule 12(c) Motions

"'Where . . . the pleadings are themselves sufficient to withstand dismissal, a failure to respond to a [Rule] 12(c) motion cannot constitute "default" justifying dismissal of the complaint.'" McCall v. Pataki, 232 F.3d 321, 322 (2d Cir. 2000) (quoting Maggette v. Dalsheim, 709 F.2d 800, 802 (2d Cir. 1983)). Although the non-moving party's failure to respond "may allow the

district court to accept the moving party's factual assertions as true, the moving party must still establish that the undisputed facts entitle [her] to a judgment as a matter of law." Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 246 (2d Cir. 2004) (internal citations and quotation marks omitted; (holding, in the context of an unopposed motion for summary judgment, that courts must review the record and determine whether the moving party has established its entitlement to judgment as a matter of law); see also Martell v. Astrue, 09 CIV. 1701 NRB, 2010 WL 4159383, at *2 n. 4 (S.D.N.Y. Oct. 20, 2010) (noting similarity between unopposed motion for summary judgment and unopposed motion for judgment on the pleadings in Social Security context, where there is a full record of the underlying administrative decision). Accordingly, the Court has reviewed the record and tested the legal sufficiency of Plaintiff's benefits claim.

Furthermore, the Court is mindful of the fact that Plaintiff is proceeding pro se. Thus, it has construed her papers "liberally" and interpreted them to raise "the strongest arguments they suggest." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994) (citation omitted); see also, e.g., Lynn v. Commissioner of Soc. Sec., NO. 11-CV-917 CBA, 2013 WL 1334030, at *10 (E.D.N.Y. Mar. 30, 2013) (applying Burgos in context of unopposed motion for judgment on the pleadings in a Social Security appeal).

**VI.  Discussion**

**A.  Standard of Review Applicable to the Commissioner's Decision**

Under the Social Security Act, the "findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In reviewing the Commissioner's decision, a court will set aside the "decision only where it is based upon legal error or is not supported by substantial evidence." Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998). Substantial evidence has been defined "more than a scintilla[,]" that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). In reviewing the ALJ's decision in light of the record, the district court does not "substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." Jones v. Sullivan, 949 F.2d 57 (2d Cir. 1991).

**B.  The RFC Assessment Is Supported By Substantial Evidence And Is Not Legally Erroneous.**

**1.  General Legal Principles**

The ALJ must consider the totality of the relevant medical and other evidence to assess a claimant's RFC, that is, her ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. §§ 404.1545(a)(3)-(4), 416.945(a)(3)-(4); SSR 96-8P, 1996

WL 374184 (S.S.A. July 2, 1996). All of the claimant's impairments, including those that are non-severe, factor into the analysis. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). When evaluating a claimant's assertions of pain and other symptoms, the ALJ first determines whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the pain or other symptoms. Only "acceptable medical sources" as defined by the Social Security regulations can provide evidence to establish a medically determinable impairment. 20 C.F.R. §§ 404.1513(a), 416.913(a).

Given the presence of a medically determinable impairment, the ALJ then considers the extent to which the claimant's symptoms are consistent with the objective medical evidence and other evidence. Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010); 20 C.F.R. §§ 404.1529(a), 416.929(a); SSR 96-4P, 1996 WL 374187 (S.S.A. July 2, 1996). In making this determination, the ALJ considers all of the evidence in case record, including statements or reports from the claimant and her treating or nontreating sources about the claimant's medical history, diagnosis, prescribed treatment, daily activities, and efforts to work, and any other evidence showing how the claimant's impairments and any related symptoms affect her ability to work. 20 C.F.R. §§ 404.1529(a), 416.929(a). Although the ALJ is required to take the claimant's reports of pain and other limitations into account, such statements alone are insufficient to

establish disability. See id.; Marcus v. Califano, 615 F.2d 23, 27
(2d Cir. 1979) ("The ALJ has discretion to evaluate the credibility
of a claimant and to arrive at an independent judgment, in light of
medical findings and other evidence, regarding the true extent of
the pain alleged by the claimant.").

    2.    **Plaintiff's Alleged Mental Impairment Is Not
Listing-Level**

Although Plaintiff apparently did not assert depression as a
basis for finding disability, the ALJ analyzed whether her
depressive symptoms met or medically equaled a listed impairment,
presumably because there were treating notes indicating a diagnosis
of depression. For instance, on January 2, 2009, Plaintiff saw
Dr. Stephen Basler on a referral from Strong Pain Center,
complaining of a variety of depressive symptoms since 2002. T.435.
She had not had any previous psychiatric treatment. Although her
affect was flat, depressed, and dysphoric, it increased and became
appropriate to content as Plaintiff became more engaged in the
evaluation. T.435. Dr. Basler's diagnosis was pain disorder
associated with both psychological factors and a general medical
condition, as well as a single major depressive episode of moderate
severity; he recommended she undergo therapy. T.436. The ALJ noted
that Plaintiff did not follow through with her mental health
providers' treatment recommendations, however. T.28.

"The 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, itself, sufficient to deem a condition severe. McConnell v. Astrue, No. 6:03-CV-0521, 2008 WL 833968, at *2 (N.D.N.Y. Mar. 27, 2008) (quoting Coleman v. Shalala, 895 F. Supp. 50, 53 (S.D.N.Y. 1995)). Although the ALJ did not find "depression" to be among Plaintiff's "severe" impairments, he nevertheless evaluated, presumably against Listing 12.04 (Affective Disorders), to determine whether it met or medically equaled a listed mental impairment. The ALJ determined, after reviewing the record, that Plaintiff did not meet or medically equal the "Paragraph A" criteria. The ALJ found it significant that her only persistent symptom was a depressed mood. Thus, even assuming the presence of her other alleged symptoms, Plaintiff only had two of the "Paragraph A" criteria for depressive syndrome, namely, anhedonia and sleep disturbance, see 20 C.F.R. Part 404, Subpart P, App. 1, §§ 12.04(1)(A)(a), (c). At least four of the Paragraph A criteria are required to be present, however, for a depressive syndrome to qualify. See id., §§ 12.04(1). Since the Paragraph A criteria were not fulfilled, the ALJ was not required to examine the Paragraph B criteria. See id. ("The required level of severity for these [affective] disorders is met when the requirements in both A and B are satisfied. . . ."). Nonetheless, the ALJ analyzed the Paragraph B criteria in relation to the record

and reasonably found that Plaintiff does not have a medically determinable mental impairment that caused more than minimal limitations in her ability to perform work-related activities. T.28.

### 3.   The RFC Assessment Is Supported By Substantial Evidence.

The opinion of a consultative examiner may constitute substantial evidence in support of an ALJ's decision. See Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995); Monquer v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983) (citations omitted). Examination findings from consultative examiner Dr. Boehlert, to whose opinion the ALJ accorded some weight, substantially supported his RFC finding. T.31-32. In fact, as discussed further below, Dr. Boehlert's opinion as to Plaintiff's limitations was less restrictive than the ALJ's.

Upon examination, Dr. Boehlert noted that Plaintiff had a normal gait and could walk on her heels and toes without difficulty. Squatting was limited to 50%, due to Plaintiff's back and knee pain. Plaintiff used no assistive devices and needed no help changing her clothes or getting on and off the examination table. She could rise from a chair without difficulty. Dr. Boehlert observed that Plaintiff's hand and finger dexterity were intact, and she had full grip strength in both hands. Tinel's sign was positive in the left wrist only. There was no loss of sensation or reflexes. Plaintiff had no loss of motion of her lumbar or thoracic

spines, and straight-leg raising test was negative. Full range of motion was evident in Plaintiff's hips and ankles, although she had limited flexion of both knees to 130 degrees due to adipose tissue atrophy. Dr. Boehlert observed trigger points in Plaintiff's chest wall bilaterally; and in her shoulders, elbows, forearms, wrists, and digits bilaterally.

Dr. Boehlert opined that Plaintiff had "mild" limitation in her ability to perform repetitive fine motor activity with both hands and "mild" limitation in her ability to perform repetitive exertion with both hands. Dr. Boehlert imposed no sitting restrictions on Plaintiff and only "mild" limitations on heavy exertion in a standing position. The ALJ viewed the medical evidence more favorably to Plaintiff and assigned greater restrictions on lifting. Thus, the ALJ's RFC assessment in fact contemplated greater restrictions than those found by the consultative physician.

The Court notes that the ALJ gave "little weight" to the state agency disability analyst's assessment on the basis that it is "an adjudicatory document and does not constitute opinion evidence within the meaning of the regulations." T.32. Again, this ultimately favored Plaintiff's position because the analyst assigned no postural limitations, whereas the ALJ did find that Plaintiff had some limitations in this regard. Thus, Plaintiff has not demonstrated that she was prejudiced by the weight afforded to

Dr. Boehlert's or the disability analyst's opinions. See Shinseki v. Sanders, 556 U.S. 396, 129 S. Ct. 1696, 1706 (2009) (burden of showing harmful error "falls on the party attacking the agency's determination") (citation omitted)).

### 4. The ALJ Did Not Err In Weighing Opinion Evidence From A Treating Source Who Is Not An Acceptable Medical Source.

A potential argument to be made by Plaintiff is that the ALJ failed to accord sufficient weight to treating source Nurse Dickinson's March 2010 restrictive opinion, T.490-91, in assessing Plaintiff's RFC. Nurse Dickinson stated that Plaintiff is "very limited" in walking, standing, sitting, lifting, carrying, pushing, pulling and climbing; had no evidence of any mental limitations; and had no evidence that she was limited in using her hands. Id. The Social Security Regulations provide that "controlling weight" will be giving to a "treating source's opinion" regarding the nature and severity of the plaintiff's impairments. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). SSR 06-3p states that controlling weight may be given to "acceptable medical sources" only. As the ALJ correctly noted, Nurse Dickinson, as a nurse practitioner, is not an "acceptable medical source", and her opinion need not be given controlling weight. See 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1); Mongeur v. Heckler, 722 F.2d at 1039.

In addition, as the ALJ explained, Nurse Dickinson's restrictive opinion was undermined by Plaintiff's self-reported

ability to babysit. T.31. Nurse Dickinson's opinion also was somewhat inconsistent with her own treatment notes: In December 2009, she found that, apart from decreased range of motion in the right knee, Plaintiff's physical examination was normal. T.349. Three months later, in March 2010, Nurse Dickinson found that Plaintiff was doing well after knee surgery could ambulate independently without assistance. T.441. Only 10 days prior to that treatment note, Nurse Dickinson had issued her medical source statement indicating that Plaintiff was very limited in her ability to ambulate. Then, in an April 2010 treatment note, Nurse Dickinson observed that Plaintiff denied experiencing any pain, and could ambulate and change positions without difficulty. T.454. When a medical provider's opinion is inconsistent with even her own treatment notes, the ALJ may properly discount that opinion. See Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, the opinion of the treating physician is not afforded controlling weight where that physician issued opinions inconsistent with other substantial evidence in the record, such as the opinions of other medical experts).

> **5. The Assessment Of Plaintiff's Credibility Is Not Erroneous Or Unsupported By Substantial Evidence.**

Another area where Plaintiff could level a challenge is the ALJ's assessment of her credibility. However, the Court agrees with

Defendant that the ALJ did not commit legal error in declining to fully accept her subjective complaints of pain and her description of her own limitations, and that the credibility assessment is supported by substantial evidence. In accordance with the applicable regulations and agency ruling, the ALJ clearly considered Plaintiff's subjective complaints and explained why he found her statements to be not fully credible. See T.29-31; 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3); 404.1529(c); 416.929(c) SSR 96-8p. The ALJ properly considered the objective medical evidence and the factors set out in 20 C.F.R. §§ 404.1529(c) and 416.929(c), including Plaintiff's treatment, medication, inconsistent statements, and daily activities. T.57-58. For example, as discussed above, the ALJ noted that Plaintiff's allegations of disabling symptoms were at odds with, e.g., Nurse Dickinson's treatment notes and Dr. Boehlert's consultative medical examination. T.29-31. While Plaintiff testified that her boyfriend did everything, Plaintiff initially reported on a benefits application form that she did the household shopping. T.236, 244, 255. She claimed that she needed her boyfriend's help in taking care of her grandson, but reported to her treating physicians that she took care of others, including her teenage daughter and sick stepmother. T.434. Plaintiff admitted to Dr. Mitchell that she was able to perform all of her activities of daily living, including taking care of her grandson, T.470, and told Nurse Pennella-Vaughan

that, with interruptions, she could do most activities, including self-care and household tasks, and caring for her grandson. T.467.

In addition, although Plaintiff reported at various times that her pain was 6 to 8 out of 10 in intensity, she was discharged from the pain clinic due to multiple no-shows and cancellations, and she waited to undergo orthopedic follow-up. T.31, 311. Nurse Pennella-Vaughan found that Plaintiff gave varying reports regarding her medication dosage and how frequently she took her medication, and even asked to be weaned off of her medication. T.31, 468. Despite her hand complaints and CTS, Plaintiff reported to Dr. Boehlert that she used a Wii game stick "a lot." T.411. She also reported to her physical therapists that did "a lot" of walking. T.486.

"If the [Commissioner]'s findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." Aponte v. Secretary, Dep't Health and Human Serv., 728 F.2d 588, 591 (2d Cir. 1984) (internal and other citations omitted). After reviewing the record as a whole, the Court cannot find that substantial evidence is lacking and therefore it must uphold the ALJ's adverse credibility assessment.

## VII. Conclusion

For the reasons discussed above, Defendant's motion for judgment on the pleadings is granted, and the Commissioner's

decision denying benefits is affirmed. Plaintiff's complaint is dismissed with prejudice. The Clerk of the Court is requested to close this case.

**SO ORDERED**.

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:   March 31, 2014
         Rochester, New York